UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IN RE:

THE DIOCESE OF BUFFALO, N.Y.,                         DECISION AND ORDER
                                                       25-CV-0535-MAV

                        Debtor.

## INTRODUCTION

Appellants, the Roman Catholic Diocese of Buffalo, New York (the "Diocese") and the Official Committee of Unsecured Creditors (the "Committee"), appeal from a June 2025 decision and order of the Bankruptcy Court granting in part and denying in part the Diocese's unopposed application for unrestricted use of proceeds from the sale of real property that was donated to the Diocese in 1959, and used from 1961 until 2021 as a Catholic seminary (the "Seminary Property"). *In re Diocese of Buffalo, N.Y.*, 670 B.R. 813 (Bankr. W.D.N.Y. 2025). The Bankruptcy Court found that approximately 65% of the proceeds from the sale were traceable to either the real property that was donated, or to the money that was given as part of a fund drive, for "the specified and lasting purpose of establishing a permanent seminary to serve the Diocese of Buffalo." *Id.* at 820. Because operation of the seminary is no longer possible, the Bankruptcy Court invoked the *cy pres* doctrine to find that that portion of the proceeds was restricted to use for clergy education. *Id.* at 821.

On appeal, Appellants maintain that the Bankruptcy Court misapplied New York law, and that the decision should be reversed. No opposition has been filed. For the reasons discussed below, the Court agrees with Appellants.

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 158, "the district courts of the United States . . . have jurisdiction to hear appeals" "from final judgments, orders, and decrees" of a bankruptcy judge. 28 U.S.C. § 158(a)(1). A district court hearing such an appeal may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Ring v. Ted's Jumbo Red Hots, Inc.*, No. 21-CV-957S, 2022 WL 465075, at *2 (W.D.N.Y. Feb. 15, 2022) (quoting *Heilbron v. Plaza*, No. 20-CV-00312 (CBA), 2021 WL 1062034, at *2 (E.D.N.Y. Mar. 19, 2021)).[1]

"[T]he district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." *Off. Comm. of Equity Sec. Holders v. Integrated Nano-Techs., Inc.*, No. 23-CV-6350-FPG, 2024 WL 3861240, at *3 (W.D.N.Y. Aug. 19, 2024) (quoting *Allen v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 483 (2d Cir. 2012) (citing former Fed. R. Bankr. P. 8013)). Mixed questions of law and fact are reviewed either de novo or under the clearly erroneous standard depending "on whether answering it entails primarily legal or factual work." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018); *see also In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 83 (S.D.N.Y. 2009).

## BACKGROUND

Appellants do not contest the Bankruptcy Court's findings of fact recited below, and this Court therefore adopts the following factual determinations as its own. *See, e.g., Educ.*

---

[1] In *Ring*, Judge Skretny also cited to *W. Milford Shopping Plaza, LLC v. Great Atl. & Pac. Tea Co., Inc. (In re Great Atl. & Pac. Tea Co., Inc.)*, No. 14-cv-4170 (NSR), 2015 WL 6395967, at *2 n. 1 (S.D.N.Y. Oct. 21, 2015), which noted that this standard derived from former Rule 8013 of the Federal Rules of Bankruptcy Procedure. Although Rule 8013 was "retired" from the Rules in 2014, courts consistently find that logic still compels the same conclusion with respect to the appellate powers of the District Court. *In re Great Atl. & Pac. Tea Co., Inc.*, 2015 WL 6395967, at *2 n. 1.

*Credit Mgmt. Corp. v. Curiston,* 351 B.R. 22, 25 (D. Conn. 2006).

> In 1959, Fred H. Reuter offered to donate approximately 80 acres of undeveloped land on Knox Road in the Town of Aurora, New York, to the Diocese of Buffalo for use as the campus of a new seminary for the training of clergy. Contemporaneously with its acceptance of this gift, the Diocese conducted what it called "The Seminary Fund Drive." Through this campaign, the Diocese collected more than $3.5 million, all of which was spent on costs of construction.[2] Groundbreaking occurred on September 8, 1960. Originally named in honor of Saint John Vianney, the seminary opened for classes on October 1, 1961.
>
> From 1961 until 2021, the [Seminary P]roperty was used as a Catholic seminary, although under several different governing and ownership arrangements. At the time of construction, the property was titled in the name of the Diocese of Buffalo, N.Y. Then in 1968, the Diocese transferred ownership to St. John Vianney Seminary, a New York Corporation. In 1974, St. John Vianney Seminary leased the property to Christ the King Seminary, a Catholic institution that relocated to the same site. The real estate was reconveyed to the Diocese of Buffalo in 1987. By 2010, Christ the King Seminary was experiencing an ongoing operating deficit which was offset in part by annual subsidies from the Diocese.
>
> The Diocese . . . filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 28, 2020. Upon its commencement of the bankruptcy proceeding, the Diocese also discontinued its subsidy of Christ the King Seminary. Unable to rely on that financial support, the seminary ceased operations at the conclusion of the 2020-2021 academic year.
>
> On July 18, 2024, the Diocese filed a motion to establish bidding procedures for an auction sale of the [Seminary] Property. At the hearing on that request, we questioned whether sale proceeds might be subject to restrictions under the *cy pres* doctrine. In an order dated August 19, 2024, the Court approved the proposed sale procedures, but with a direction that "[t]he net proceeds of sale of the Property shall be placed in a segregated account held by the Diocese and shall not be disbursed therefrom except as directed by further Order of this Court." Pursuant to this authority, the Diocese conducted an auction on October 28, 2024. On November 20, 2024, the Court entered an Order confirming a sale to the high bidder for $4,200,000. The closing of this transaction then occurred on February 14, 2025.

*In re Diocese of Buffalo, N.Y.,* 670 B.R. at 816–17.

---

[2] In addition to the $3.5 million raised in The Seminary Fund Drive, it is uncontested that the Diocese also spent approximately $2.2 million of its own funds. *See, In re Diocese of Buffalo, N.Y.,* 670 B.R. at 819 n. 2; ECF No. 7 at 7.

Following close of the sale of the seminary, the Diocese moved the Bankruptcy Court to allow access to the proceeds of the sale, arguing "that the Sale Proceeds are property of the estate, and as such, the Diocese is requesting that the Diocese be authorized, but not directed, to use such proceeds in connection with funding a settlement in this case pursuant to a chapter 11 plan." *In re Diocese of Buffalo*, N.Y., 670 B.R. at 817.

In rendering a decision on the Diocese's motion, the Bankruptcy Court observed that § 513(b) of the New York Not-for-Profit Corporation Law applied to the Diocese, and "mandates that the Diocese apply gifted funds 'to the purposes specified in the gift instrument . . . .'" *Id.* at 819. To discern what those purposes were, the Bankruptcy Court relied upon archival records submitted by the Diocese, as well as old editions of the *Catholic Union and Echo* – a weekly newspaper published by the Diocese – which the Bankruptcy Court reviewed on its own initiative. *Id.* at 818. "Based on a careful review of these factual sources, [the Bankruptcy Court found] that most, but not all of the sale proceeds [were] subject to the restraints of New York's *cy pres* doctrine." *Id.*

In other words, the Bankruptcy Court found that the Reuter donation of the Seminary Property, and donor contributions to The Seminary Fund Drive, created an "implied trust" which restricted the Diocese to use of the property and funds only for the purposes of establishing a permanent seminary. *Id.* at 821 (citing *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 496 (N.Y. App. Div. 1979)). Because the operation of the seminary is no longer practicable or possible, the Bankruptcy Court applied the *cy pres* doctrine[3] to find that the proceeds of the sale of the seminary were "subject to the restriction that it be used

---

[3] "The *cy pres* doctrine codified in [New York Estates, Powers and Trusts Law] § 8–1.1 is based on a policy to effectuate the general charitable intention of a donor or testator where the specific donative direction cannot be carried out, or is no longer practicable." *In re Est. of Othmer*, 710 N.Y.S.2d 444, 850 (N.Y. Surr. Ct. 2006).

4

for the benefit of clergy education." *Id.* at 821.

Noting that 11 U.S.C. § 541(c)(2) provided for the enforcement of restrictions on transfers of interests which are enforceable under applicable nonbankruptcy law, the Bankruptcy Court awarded the Diocese unrestricted access to that portion of the sale proceeds which represented the Diocese's investment of its own funds in the construction of the seminary (35.32% of the proceeds), but awarded only restricted access to that portion of the sale proceeds which were "traceable" to The Seminary Fund Drive or the real property donated by the Reuter family (64.68%). *Id.* at 822.

## DISCUSSION

In its brief, the Diocese maintains that the Bankruptcy Court's decision erred on four principal points: (1) by concluding that the proceeds of the sale were restricted by "a uniform, collective donor intent that gifts of monies and property to the Diocese to build a seminary were restricted in use in perpetuity for the benefit of clergy education" (ECF No. 7 at 23); (2) by finding that the Diocese was holding the sale proceeds in trust because the donative intent created an implied trust (*Id.* at 35); (3) by basing the decision on facts outside of the record (*i.e.,* facts drawn from the *Catholic Union and Echo*) and which were not subject to judicial notice (*Id.* at 39); and (4) by using an unsupported methodology to formulate its pro rata allocation of the sale proceeds into restricted and unrestricted funds (*Id.* at 41). The Committee's brief echoes the Diocese's brief on the first two points, but also argues that 11 U.S.C. § 544(a)(3) vitiates any unrecorded restriction, and that the Bankruptcy Court incorrectly traced donations to the sale proceeds. ECF No. 6.

The Court reviews the Bankruptcy Court's legal conclusions de novo. Based on the record, the Court agrees with the Diocese and the Committee that the proceeds from the

seminary sale are not subject to the *cy pres* doctrine, and therefore that the Diocese is not bound to use a portion of those proceeds for the benefit of clergy education. Rather, the Court finds that while the gifts were made with the intent that they be used for the construction of a seminary, that intent has long since been satisfied. Because the Court resolves the appeal on that issue, it declines to address Appellants' other arguments.

## I. Legal Principles

The New York Not-for-Profit Corporation Law ("NPCL") applies to religious corporations such as the Diocese as provided in New York Religious Corporations Law § 2-b. Under NPCL § 513(a), "a charitable corporation shall hold full ownership rights in any assets consisting of funds or other real or personal property of any kind, that may be given, granted, bequeathed or devised to or otherwise vested in such corporation in trust for, or with a direction to apply the same to, any purpose specified in its certificate of incorporation . . . ." However, it is well-settled under New York law that when gifts are given for a specific purpose, the corporation receiving the gifts must devote them to the purposes for which they are given. *Lefkowitz v. Cornell Univ.*, 35 A.D.2d 166, 171 (N.Y. App. Div. 1970), *aff'd*, 271 N.E.2d 552 (N.Y. 1971) (citing, *inter alia*, *St. Joseph's Hospital v. Bennett*, 281 N.Y. 115 (N.Y. 1939)). Indeed, NPCL § 513(b) requires that charitable and religious corporations "shall apply all assets thus received to the purposes specified in the gift instrument . . . and to the payment of the reasonable and proper expenses of administration of such assets."

## II. Donor Purposes in the Instant Case

"When a court determines that changed circumstances have rendered the administration of a charitable trust according to its literal terms either 'impracticable or

6

impossible,' the court may exercise its *cy pres* power to reform the trust in a matter that 'will most effectively accomplish its general purposes.'" *Matter of Est. of Wilson*, 452 N.E.2d 1228, 1232 (N.Y. 1983) (quoting EPTL 8-1.1). Here, the Court cannot – and need not – invoke the *cy pres* doctrine because the donors' specific charitable purposes have already been satisfied, and there is no charitable trust to reform.

"In order to find that a restriction has been placed upon the use of a gift to a charitable corporation, such restriction must be clearly expressed." *Lefkowitz*, 35 A.D.2d at 171. After a thorough review of the record, the Court finds no clear expression by the Reuters, by the donors to The Seminary Fund Drive, or in the Diocese's solicitations of an intent that the donations be restricted in perpetuity. Rather, both the Seminary Property and the money from The Seminary Fund Drive were intended to be used to construct a seminary on the Seminary Property. Once the seminary was constructed on the Seminary Property, and the funds raised from The Seminary Fund Drive exhausted in the process, the Diocese satisfied the requirements of NPCL § 513(b), and the property and funds were not subject to an implied trust imposing constraints enforceable in bankruptcy.

## A. The Real Property

The Diocese has produced archival records indicating that Mr. and Mrs. Reuter were "very happy that [their] property [would] be used by the Diocese of Buffalo for such a worthy and necessary purpose as a seminary." ECF No. 3-12. However, there is no indication in the record that they required the property to be used as a seminary in perpetuity.[4] In fact, the deeds transferring the property to the Diocese make no mention

---

[4] The Bankruptcy Court cited the Bishop's statement in a newspaper article that "Please God, for centuries to come, [the Reuters'] names and their gift will be held in prayerful memory" as evidence that the Reuters intended that their property be forever used as a seminary. The Court agrees with Appellants that such language was essentially "precatory in nature," and insufficient to create a perpetual restriction. *See, e.g.,*

at all of the purpose of the transfer, and expressly recognize the possibility that the Diocese will transfer the property in the future. Moreover, other evidence in the record supports the inference that the Reuters did not intend to impose perpetual restrictions on their gift of the Seminary Property.

### i. The Language of the Deeds

"The Diocese received title to the Seminary Property through three deeds conveyed by" Mr. Reuter. ECF No. 3-12 at 2. The first deed, executed on December 10, 1959, granted one parcel of the Property to the Diocese in consideration of $1.00, but did not specify any particular purposes which the parcel must serve. ECF No. 3-12 at 51–53. Further, the habendum clause on page 2 of the deed recited "To have and to hold the premises herein granted unto the party of the second part, its successors and assigns forever." *Id.* at 52. This is precisely the language cited by the Appellate Division in *Lefkowitz v. Cornell Univ.*, which found that "the use of these words is inconsistent with an intent that" the transferee be forever obligated to use the transferred property as a public trust. *Lefkowitz*, 35 A.D.2d at 172. The deed for the second parcel, executed in January 1960, also failed to specify a purpose for which the property had to be used, and included the same language as the first deed in its habendum clause. *Id.* at 54–57. Although the deed for the third parcel, executed in June 1960, did not use the word "successors," it did include the word "assigns" and also failed to specify a purpose for which the property had to be used. *Id.* at 58–60.

### ii. Other Evidence

In addition to the absence of a clearly expressed restriction in the deeds themselves, other record evidence also suggests the Reuters did not intend to perpetually restrict the

---

*Suffolk Cnty. v. Greater New York Councils, Boy Scouts of Am.*, 413 N.E.2d 363 (N.Y. 1980) (finding "It is my wish" to be essentially precatory).

use of the Seminary Property. For example, a resolution adopted by the Board of Trustees of the seminary in 1970, of which Mr. Reuter was a part, suggests that there was no understanding that the property had to be used as a seminary in perpetuity. *Id.* at 48–49. The resolution stated, in pertinent part:

> RESOLVED that in the event the [Seminary Property] . . . is no longer used as a seminary for the education of young men to the priesthood, title to this property shall be reconveyed to the previous owner, The Diocese of Buffalo, N.Y., in consideration of the subvention made by The Diocese to the Seminary . . . .

*Id.* at 48. While Mr. Reuter was absent from the particular meeting at which this resolution was passed, it appears that he was present at other meetings at which the resolution was discussed. *Id.* at 3. Nevertheless, no objection was recorded regarding the prospect that the Seminary Property may at some point be no longer used as a seminary.

In short, there is no evidence in the record that the Reuters sought to perpetually preclude the Diocese from repurposing or even selling the Seminary Property. *See, e.g., Dennis v. Buffalo Fine Arts Acad.*, 836 N.Y.S.2d 496 (N.Y. Sup. Ct. 2007) (declining to restrict an art museum from selling art pieces where there was no evidence that specific restriction was intended). Thus, the Court finds that the Reuters' transfer of the Seminary Property to the Diocese imposed no obligation that the seminary once constructed be maintained "forever." *See, e.g., Suffolk Cnty.*, 413 N.E.2d at 363 (finding that a bequest stating "It is my wish that the proceeds of this gift . . . shall be used . . . for the establishment of a new camp on Long Island . . ." imposed "no obligation that the camp once established be maintained 'forever'"). Accordingly, the Court finds that the proceeds of the sale of the Seminary Property traceable to the Reuter gift are not restricted.

## B. The Seminary Fund Drive

As indicated above, NPCL § 513(b) requires that where a donation is made for a specific purpose, the charitable or religious corporation receiving that gift "shall apply all assets thus received to the purposes specified in the gift instrument . . . ." The New York legislature has defined "gift instrument" broadly: it "means a record or records, including an institutional solicitation, under which property is granted to, transferred to, or held by an institution as an institutional fund." NPCL § 551(c). A "record" in this definition "means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." NPCL § 551(i).

Unfortunately, there do not appear to be any express "gift instruments" in the record before this Court from The Seminary Fund Drive. Despite an effort consisting of such solicitations as $50,000 or more for a specific project ("like a library"), $25,000 for a memorial, $100 for a "Bishop's Seminary Testimonial Certificate," and $25 for a "Spiritual Seminary Bond," the Diocese's search of its archival records did not produce a single subscription pledge, "Testimonial Certificate," or "Spiritual Bond" for review by the courts. ECF No. 3-12 at 4–5. Nevertheless, the search of the archival records did produce a number of planning documents that support the Diocese's position that the intent of the drive as it was communicated to donors was to raise money to build a seminary.

For instance, in the formal project plan for The Seminary Fund Drive, the authors identify the "proposition" driving the entire effort as "[t]o finance the building of a Diocesan Seminary which will cost $3,000,000." ECF No. 3-12 at 13. In addition, a letter to parish priests from the director of the drive, Monsignor Eugene A. Loftus, sent approximately one month before The Seminary Fund Drive began, emphasized that the drive "is a Building

10

Drive" asking people to give "to a great building that is needed." *Id.* at 17. This was followed by a letter to parish leaders in the week leading up to The Seminary Fund Drive providing guidance for "Seminary Week," which stated that "The Seminary Fund is designed to meet the need of the Diocese of Buffalo to erect a new Seminary . . . ." *Id.* at 38. Finally, there is a "Suggested Sermon Outline" for the Sunday Mass to kick off "Seminary Week," which was presumedly distributed to priests of the parishes for delivery to their parishioners (i.e., their donor base) from the pulpit. ECF No. 41. This outline suggested that the priests emphasize several points, including that "the faithful of the Diocese of Buffalo will be asked . . . to erect a major seminary"; that "[a]s long as the Seminary stands," generations of seminarians will pray daily for the donors of spiritual bonds; and that the $25.00 Seminary Bond, payable over two years, amounted to asking parishioners to make "an offering of about one dollar per month to help build this Seminary for the Diocese of Buffalo." *Id.* at 41. Lastly, the record contains another letter to priests from Monsignor Loftus, this one encouraging them to finish Seminary Week strong, which observes that "[t]he vital aspect is to build the Seminary." *Id.* at 42.

Because there is no express "gift instrument" in the record clearly restricting the use of the donations to The Seminary Fund Drive, and because the documents that do exist discussing the purpose of the drive indicate that Diocesan communications suggested the animating principle of the drive was to raise funds to *build* a seminary, the Court finds that the funds donated to the Seminary Fund Drive were given for the purpose of constructing a seminary for the Diocese of Buffalo. It is not disputed that the funds were so used, and that a Catholic seminary did, in fact, operate on the Seminary Property for

decades. Therefore, the Court finds that the proceeds of the sale of the Seminary Property traceable to The Seminary Fund Drive are not restricted.

## CONCLUSION

For the foregoing reasons, Appellants' appeal is GRANTED. The Bankruptcy Court's application of the *cy pres* doctrine to find that the Diocese's use of proceeds from the sale of the Seminary Property traceable to the Reuter donation and The Seminary Fund Drive is restricted is REVERSED. The case is remanded for further proceedings.

SO ORDERED.

Dated:        June __10__, 2026
                Rochester, New York

                                            HON. MEREDITH A. VACCA
                                            United States District Judge